UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 16-20374-CR-WILLIAMS

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

MANUEL FELIPE ARENALES MONROY,

        Defendant.

_____/

SENTENCING MEMORANDUM

Mr. Arenales pled guilty to a one count Indictment charging him with conspiring to distribute cocaine. The Pre-Sentence Investigation Report (hereinafter "PSI") found Mr. Arenales' Criminal History within Category I with a Total Offense Level of 33: his guideline range is 135-168 months. (ECF No. 19). The Government and the defense have one unresolved objection to that PSI, which does not affect the guideline range.[1] The Government has committed to recommend a sentence at the bottom of that range.

    I.    RECOMMENDATION

Mr. Arenales began cooperating with the Government before his extradition from Guatemala. He was arrested in November of 2016, and after hiring a lawyer, he was transported to a courthouse in Guatemala City in January of 2017 and debriefed by several agents of the Drug Enforcement Administration and the Assistant United States

---

[1] The Government notified the Probation Office in a letter dated January 30, 2018, that it was "not prepared to provide proof of the conduct" contained in Paragraph 10 of the PSI, and the defense joined that objection in a letter dated February 6, 2018. We asked the Probation Office to delete that paragraph, and its response was that it will defer to the judgment of this Court.

1

Attorney handling this matter. The United States will acknowledge at sentencing that Mr. Arenales has been both forthright and cooperative, but because his cooperation has not reached fruition, his assistance will not result in the filing of a § 5K1 motion. This Court can, however, acknowledge his decision to cooperate as evidence of his remorse and acceptance of responsibility and as a factor under 18 U.S.C. §3553(a).

Based upon that decision to cooperate, as well as (1) a proposed 2018 Sentencing Guidelines amendment, which would reduce the bottom of Mr. Arenales' guideline range to 121 months, see III.A, infra, (2) the harshness of the current narcotics sentencing guidelines and the unlikelihood of recidivism, see III.B and C, infra, (3) Mr. Arenales' 10 months of pre-extradition incarceration in a third world Guatemalan "shanty town", see III.D, infra, and (4) the positive influence Mr. Arenales has had on his fellow inmates and family, see III.E, infra, we believe that a fair and reasonable sentence is 100 months of incarceration.

    II.    THE PERSONAL HISTORY OF MR. ARENALES

Manuel Felipe Arenales Monroy was born in a small town in Guatemala called Chimaltenago on November 13, 1980, but his childhood was short-lived. His father owned several vehicles which served as the town's local transportation system and this business enabled him to support his family and purchase a small farm/residence. The father died unexpectedly when Felipe was 11 years old, and the family's unanticipated financial hardship required that Felipe only go to school part-time because his mother needed his help with the farm and the family business. See, PSI at ¶¶ 35-38.

When he was 17, and the family's sole potential source of income, Felipe sold the family farm and purchased an auto parts store. The store did not fare well, so Felipe expanded the business to sell other automotive equipment, vehicle accessories and

motorcycles. Felipe also began racing motorcycles as a way to advertise this business and became well-known on this racing circuit. This modest popularity led him to begin selling automobiles in Guatemala City. It was through racing bikes and selling cars that Felipe met the people who would ultimately introduce him to the activity which led to this Indictment.

On a personal level, he married his wife, Isabel, in 2002, and they have three children, Felipe, age 13, Pablo, age 10, and a daughter, Isabel, who is 6. He is also very close to his siblings, and is the sole support for his mother, who is an evangelical minister in Guatemala. Through her influence, Felipe was an active participant in her ministry, and this experience, and his deep religious beliefs, led to his being an instrumental religious leader while incarcerated, as he helped lead the inmate religious services during the 10 months he awaited extradition in the Mariscal Zavala prison camp. See, PSI at ¶¶ 38-39.

III.    GROUNDS FOR A BELOW-GUIDELINE RANGE VARIANCE

The Guidelines are but one of many factors to consider in fashioning a reasonable sentence, see, 18 U.S.C. § 3553(a), and it is impermissible to consider the advisory guideline range as presumptive. Section 3553(a) further directs sentencing judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph two." Subsection (2) states that such purposes include "consideration of the nature and circumstances of the offense and the history and characteristics of the defendant" as well as the need for the sentence: to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the

most effective manner. See, § 3553(a)(2). This memorandum suggests several reasons why a below-guideline range sentence is reasonable.

### A. The effect of the proposed 2018 Guideline amendments

The PSI reports that Mr. Arenales has never before been arrested, thus falls within Category I to Section 4A of the Guidelines. See, PSI at ¶¶ 27-32. The fact that Mr. Arenales has no prior arrests allows this Court to exercise its discretion and find that a proposed guideline amendment which should take effect later this year will lower his guideline range one level and 14 months, to a level 32 and a bottom guideline range of 121 months.

The United States Sentencing Commission has a duty to consider guideline amendments every year, and in 2017, entertained submissions from various academic, professional and governmental entities on how the guidelines might be amended to better reflect evolving standards concerning punishment, rehabilitation and treatment. That annual review process resulted in the filing of proposed amendments. See, https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20170824_rf_proposed.pdf.

Those contributors brought to the attention of the Committee an unfairness regarding criminal history calculations within Category I, and the Committee accepted a recommendation which would cure that inequity. See, supra, "PROPOSED AMENDMENT: FIRST OFFENDERS /ALTERNATIVES TO INCARCERATION at pp. 20-37. In its proposal to amend the Guidelines within Category I, the Commission wrote:

> Under the Guidelines Manual, offenders with minimal or no criminal history are classified into Criminal History Category I. "First offenders," offenders with no criminal history, are addressed in the guidelines only by reference to Criminal History Category I. **However, Criminal History Category I includes not only "first" offenders but also offenders with varying criminal histories,**

4

> **such as offenders with no criminal history points and those with one criminal history point**. Accordingly, the following offenders are classified in the same category: (1) first time offenders with no prior convictions; (2) offenders who have prior convictions that are not counted because they were not within the time limits set forth in §4A1.2(d) and (e); (3) offenders who have prior convictions that are not used in computing the criminal history category for reasons other than their "staleness" (e.g., sentences resulting from foreign or tribal court convictions, minor misdemeanor convictions or infractions); and (4) offenders with a prior conviction that received only one criminal history point.

Supra at p. 20. [emphasis supplied]

In other words, the Commission observed that defendants who have never before been arrested are grouped, unfairly, with defendants who have had several prior arrests which have been fortuitously excluded because of the age of the arrest or where that arrest took place. The Commission proposed the following amendment to rectify this inequity:

> Part A of the proposed amendment provides two options for defining a "first offender" who would be eligible for a decrease in offense level under the new guideline. Option 1 defines a defendant as a "first offender" if the defendant did not receive any criminal history points from Chapter Four, Part A. Option 2 defines a defendant as a "first offender" if the defendant has no prior convictions of any kind.
>
> Part A also provides two options for the decrease in offense level that would apply to a first offender. **Option 1 provides a decrease of [1] level from the offense level determined under Chapters Two and Three. Option 2 provides a decrease of [2] levels if the final offense level determined under Chapters Two and Three is less than level [16], or a decrease of [1] level if the offense level determined under Chapters Two and Three is level [16] or greater…**

Supra at pp. 20-21. [ emphasis suppled]

The proposed amendment will apply to Mr. Arenales, as he had never been arrested before this case. In other words, if he were to be sentenced 7 months later, and this amendment went into effect, his guidelines would be one level lower. See, PSI at ¶¶ 27-32. Since 1987, the history of the Guidelines reflects a liberal adoption of Sentencing

5

Commission recommendations. Therefore, our request for a downward variance is <u>not</u> from a level of 33 and a bottom range of 135 months, but from a level of 32 and a bottom range of 121 months.

### B. <u>The harshness of narcotics sentencing</u>

We begin by noting that the Sentencing Commission has repeatedly recognized the undue harshness of the narcotics guidelines. <u>See</u>, United States Sentencing Commission, <u>Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform</u>, November 2004 (available at http://www.ussc.gov/) ("73.7 percent of district court judges and 82.7 percent of circuit court judges [rate] drug punishments as greater than appropriate to reflect the seriousness of drug trafficking offenses.") <u>Id</u>. at 52.

This Court has the authority to ameliorate that harshness. Supreme Court cases make clear that a district court should deviate from the Guidelines if it feels that an advisory guidelines sentence is greater than necessary to satisfy the factors of § 3553(a). That Court mandated the consideration of all mitigating factors and admonished judges to not inflexibly follow guideline policy statements which limit the consideration of mitigating factors. <u>See</u>, <u>United States v. Rita</u>, 551 U.S. 338 (2007) and <u>United States v. Gall</u>, 552 U.S. 50, 58-60 (2007). The Court wrote in <u>Kimbrough v. United States</u>, 552 U.S. 85, 101 (2007), that a sentencing court must utilize its own independent judgment and its own policy considerations, even if those judgments are inconsistent with the Guidelines. A consideration of those factors suggests that a sentence below the advisory guideline range is appropriate here.

The advisory guideline in this case, with a low-end range of 135 months ( or, as

we suggest, 121 months), is extraordinarily harsh. Mr. Arenales is a first-time offender and has not been implicated in violence, obstruction of justice, or contempt for the criminal process. He waived extradition and pled guilty once he arrived in Miami.

The harshness of this punishment matrix has been the focal point of judicial and other learned commentary since the inception of the Guidelines. Studies have shown that there is no empirical relationship between the lengths of a sentence and specific or general deterrence, whether it is a white collar or drug offense, or a violent crime or larceny. See, United States Sentencing Commission, Staff Discussion Paper, Sentencing Options Under the Guidelines, pp 18-19 (Nov. 1996); Paul J. Hofer, Federal Sentencing for Violent and Drug Trafficking Crimes Involving Firearms: Recent Changes and Prospects for Improvement, 37 Am. Crim. L. Rev. 41, 72 n.106 (2000).

Sentencing trends suggest a variance below the guideline range is not an aberration. The Interactive Sourcebook of Federal Sentencing Statistics reports that, in 2016, its most recent compilation, a below guideline range variance based upon Booker/§3553 had a national average of 20.8% (Table N), an 11th Circuit average of 25.3% (Table N-11) and a SDFL average of 28.6% (Table 26). See, USSC Interactive Sourcebook at **https://isb.ussc.gov/Login**. These studies, and this Court's experience, suggest that the facts of this case do not compel a guideline sentence.

C. The unlikelihood of recidivism

This factor must be considered under Section 3553(a). And this factor weighs heavily toward a downward variance, where the likelihood of recidivism by Mr. Arenales is virtually zero.

Various studies and reports shed great light in this area and suggest that the likelihood that a person with no criminal history points recidivates is less than 10%. Those

7

studies also demonstrate that recidivism declines dramatically with age, and that while a person under the age of 21 will become a repeat offender 35% of the time, the percentage drops to less than 10% when an individual reaches the age of 30. Mr. Arenales is 38, and unlikely to engage in criminal conduct again, as he is both out of the milieu he was in at the time of the offense, and by the time he exits the Bureau of Prisons, he will be even older, thus even less likely to become re-involved in criminal activity. See, United States Sentencing Commission, Recidivism and the "First Offender" (May 2004) (available at http://www.ussc.gov.).  Since the need to protect the public from further crimes by Mr. Arenales is virtually nil, a significant term of incarceration is not needed to protect the public from future criminality.

The most empirical measure of Mr. Arenales' unlikelihood of recidivism is the decision he made to cooperate. Generally, that decision is a specific statement that an individual has placed their illegal conduct behind them and has evidenced an intent to lead a law-abiding life. This jettisoning of a person's past, and the "burning of bridges" between an individual and his past associates, is a clear signal that an individual has set aside his wayward past and intends to live a law-abiding future.

### D. The conditions of pre-extradition incarceration

Mr. Arenales was arrested in Guatemala on November 3, 2016, and after retaining local counsel, filed pleadings in the Guatemalan court urging an expeditious extradition. His eagerness to get to the United States and commence his cooperation was one factor. The other was the horrid conditions inmates live under in the Mariscal Zavala, the "camp" where extraditees are housed.

We use the word "camp", rather than jail or prison, because this complex is unlike anything undersigned counsel has ever encountered, after having been (a visitor!) in

8

prisons throughout the world. This is the first and only complex where there are no officers or guards inside its perimeter, and it is incumbent upon the inmates to house, cloth, and feed themselves, as well as provide their own security. It is little more than a decrepit shanty town, comparable to infamous favelas throughout Central and South America.

This facility is not so much a jail or a prison as it is a makeshift camp, not unlike homeless Americans build to stay warm and dry. It was originally a fenced-in military camp just outside of Guatemala City which was torn down, leaving only a concrete foundation. Once it was adapted to house inmates for extradition and "special inmates", the detainees were forced to create their own living quarters. They raised tents, built toilets and showers, and constructed rooms with bunks for sleeping and basic plumbing.

What is most peculiar about this "inmate city" is that there are no correction officers within its fenced-in perimeter. While armed military officers control entry and exit for visitors, once inside the fence, only inmates occupy the grounds, enforce discipline and oversee housing, distribution of food and all other manner of living conditions.

We have attached photographs which depict this unhygienic and "third-world" den of inhospitality. <u>See</u>, Exhibit One, Composite Photographs of Mariscal Zavala. The expression "a picture is worth a thousand words" has never been more apt.

A recent opinion piece in a local Guatemalan newspaper was more descriptive; an article describing this camp appeared in elPeriodico on February 24, 2018:

> <u>The other part of the "preventive" detention center that I will call "general" is the closest thing to a camp of Syrian or African refugees that you see in the news or in the movies</u>. I am not going to say that these are inhumane conditions in which the detainees live, but neither are they a hotel or a holiday resort, as one stupid Facebook said when they were allowed to write "where the great life is taking place"; frankly there are innocent people, deprived of freedom one of the fundamental human rights, as well as suffering from endless discomfort, which should sue the State to leave, for millions of dollars,

9

>as usually do certain ideas, which has enriched adducing imaginary damage. These compensations should be paid by their pockets inefficient and arrogant prosecutors and unworthy judges who issue unjust decisions wanting to be well with their foreign masters.

See, https://elperiodico.com.gt/opinion/2018/02/24/mariscal-zavala.[translation by Google Translate; emphasis supplied]

A district court is entitled to consider onerous conditions of incarceration in determining whether to grant a downward variance. United States v. Francis, 129 F. Supp. 612 (S.D.N.Y. 2001); United States v. Mateo, 299 F. Supp. 201 (S.D.N.Y. 2004). At least two circuit courts of appeal have approved a sentencing court's consideration of this factor in granting a downward variance. See, United States v. Carty, 264 F. 3d 191 (2nd Cir. 2001) and United States v. Pressley, 345 F. 3d 1205 (11th Cir. 2000) (district court statement that, if authorized by law, it would grant a two for one sentencing reduction based upon the defendant's onerous pre-trial incarceration is within court's discretion).

Mr. Arenales was incarcerated in this camp for just under 10 months. We ask that the conditions he experienced be considered in the fashioning of a reasonable sentence, and that this Court find that those jail conditions warrant a downward variance.

### E. The personal letters reflecting the character of Mr. Arenales

Mr. Arenales has a significant support system for when he leaves the Bureau of Prisons. We have filed, as attachments to this pleading, letters from various family members and friends to showcase the character and respect those individuals hold for him. While these people wish they could crowd the courtroom to express these feelings, their poverty and foreign residence prevents that from occurring. The letters are simple and sincere, much like the people who were asked to author these remarks regarding the character and background of Mr. Arenales. This memorandum has culled from these letters their most compelling statements and thoughts. See, Exhibit Two, Composite

letters.

For example, Pastor Abelardo Benjamin Castillo Gramajo, the minister who directed the religious assembly within the Mariscal Zavala, wrote that Felipe was instrumental in "[p]romoting the motivation of opening a Christian library and founder of one of the cells (group) with spiritual instruction teachings." Spokesmen for the sectors within the prison wrote to declare that Felipe "always showed education, good habits, honesty and respect when acting with the other partners and…donated the library of this center, physical infrastructure, as well as the furniture and equipment, and donated the musical instruments for the Christian church in the center…."

The letters also express the thoughts of the family members who could not fill this courtroom at sentencing. His younger sister, Lubina, and his aunt, Ayxa Yanet, and a friend of the family, Julio Can Castro, all recall how Felipe, as the oldest of three brothers, assumed the hardship of becoming the patriarch of the family after the premature death of their father. Belarmino Martinez Axpuac, of the Church of Christ Central Elim, writes to let this Court know that Felipe "has been a support for his mother by being widowed at the age of 31 years. Mr. Arenales Monroy took the responsibility at 11 years of age to take care of his brothers, 8 and 3 years old, who needed their care and support as elder brother." His wife, Marina Isabel, writes of the 16 years they have been married and the wonderful father Felipe is to their three children; how he would take them to school, and provide for them a Christian education. Marina acknowledges that her husband has violated the law, and for that he must be responsible, and writes only to provide the Court with an understanding of his other and better qualities.

Finally, Felipe's charitable work preceded his legal issue; we say that because

often a defendant only becomes charitable as a way to lower a prospective sentence. A neighbor, Leonel Estuardo Cuyun Gonzalez, writes that Felipe "has had the good habit of helping his fellow men . . . including our neighbor, who has already passed away. Being she, an elderly person who needed economic help for her medications and medical exams, she received his generous help…."

IV. CONCLUSION

Mr. Arenales committed a serious crime and has accepted responsibility for his actions. He demonstrated remorse and acceptance of responsibility in the most significant way the law permits to make amends for his conduct—cooperation with law enforcement. We ask that the sentence of this Court temper his wrongs against these amends, and respectfully recommend a sentence of 100 months.

Respectfully submitted,

Peter Raben, Esquire
6409 Grebe Court
Lake Worth, Fl. 33463
Fl. Bar No. 231045
praben@bellsouth.net

By: /s/ Peter Raben

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Sentencing Memorandum has been electronically filed with the Clerk of the Court using CM/ECF and furnished by electronic delivery on this 5th day of April, 2018 to the following:

Walter Norkin, AUSA
U.S. Attorney's Office
Walter.Norkin@usdoj.gov

By: /s/ Peter Raben

13